27 U.S. 449 (____)
2 Pet. 449
PLOWDEN WESTON AND OTHERS, PLAINTIFFS IN ERROR
vs.
THE CITY COUNCIL OF CHARLESTON, DEFENDANTS.
Supreme Court of United States.

*451 The case was argued by Mr Hayne, for the plaintiffs in error; and by Mr Cruger and Mr Legare, for the defendants.
*463 Mr Chief Justice MARSHALL delivered the opinion of the Court.
This case was argued on its merits at a preceding term; but a doubt having arisen with the Court respecting its jurisdiction in cases of prohibition, that doubt was suggested to the bar, and a re-argument was requested. It has been reargued at this term.
The power of this Court to revise the judgments of a state tribunal, depends on the 25th section of the judicial act. That section enacts "that a final judgment or decree in any suit in the highest court of law or equity of a state in which a decision in the suit could be had," "where is drawn in question the validity of a statute or of an authority exercised under any state, on the ground of their being repugnant to the constitution, treaties, or laws of the United States, and the decision is in favour of such their validity," "may be re-examined and reversed or affirmed in the Supreme Court of the United States."
In this case the city ordinance of Charleston is the exercise of an "authority under the state of South Carolina," *464 "the validity of which has been drawn in question on the ground of its being repugnant to the constitution," and "the decision is in favour of its validity." The question therefore which was decided by the constitutional court, is the very question on which the revising power of this tribunal is to be exercised, and the only inquiry is, whether it has been decided in a case described in the section which authorises the writ of error that has been awarded. Is a writ of prohibition a suit?
The term is certainly a very comprehensive one, and is understood to apply to any proceeding in a court of justice, by which an individual pursues that remedy in a court of justice, which the law affords him. The modes of proceeding may be various, but if a right is litigated between parties in a court of justice, the proceeding by which the decision of the court is sought, is a suit. The question between the parties, is precisely the same as it would have been in a writ of replevin, or in an action of trespass. The constitutionality of the ordinance is contested; the party aggrieved by it applies to a court; and at his suggestion, a writ of prohibition, the appropriate remedy, is issued. The opposite party appeals; and, in the highest court, the judgment is reversed and judgment given for the defendant. This judgment was, we think, rendered in a suit.
We think also that it was a final judgment in the sense in which that term is used in the 25th section of the judicial act. If it were applicable to those judgments and decrees only in which the right was finally decided, and could never again be litigated between the parties, the provisions of the section would be confined within much narrower limits than the words import, or than congress could have intended. Judgments in actions of ejectment, and decrees in chancery dismissing a bill without prejudice, however deeply they might affect rights protected by the constitution, laws, or treaties of the United States, would not be subject to the revision of this Court. A prohibition might issue, restraining a collector from collecting duties, and this Court would not revise and correct the judgment. The word "final" must be understood in the section under consideration, as applying *465 to all judgments and decrees which determine the particular cause.
We think then that the writ of error has brought the cause properly before this Court.
This brings us to the main question. Is the stock issued for loans made to the government of the United States liable to be taxed by states and corporations?
Congress has power "to borrow money on the credit of the United States." The stock it issues is the evidence of a debt created by the exercise of this power. The tax in question is a tax upon the contract subsisting between the government and the individual. It bears directly upon that contract, while subsisting and in full force. The power operates upon the contract the instant it is framed, and must imply a right to affect that contract.
If the states and corporations throughout the union, possess the power to tax a contract for the loan of money, what shall arrest this principle in its application to every other contract? What measure can government adopt which will not be exposed to its influence?
But it is unnecessary to pursue this principle through its diversified application to all the contracts, and to the various operations of government. No one can be selected which is of more vital interest to the community than this of borrowing money on the credit of the United States. No power has been conferred by the American people on their government, the free and unburthened exercise of which more deeply affects every member of our republic. In war, when the honour, the safety, the independence of the nation are to be defended, when all its resources are to be strained to the utmost, credit must be brought in aid of taxation, and the abundant revenue of peace and prosperity must be anticipated to supply the exigences, the urgent demands of the moment. The people, for objects the most important which can occur in the progress of nations, have empowered their government to make these anticipations, "to borrow money on the credit of the United States." Can any thing be more dangerous, or more injurious, than the admission of a principle which authorizes every state and every corporation in *466 the union which possesses the right of taxation, to burthen the exercise of this power at their discretion?
If the right to impose the tax exists, it is a right which in its nature acknowledges no limits. It may be carried to any extent within the jurisdiction of the state or corporation which imposes it, which the will of each state and corporation may prescribe. A power which is given by the whole American people for their common good, which is to be exercised at the most critical periods for the most important purposes, on the free exercise of which the interests certainly, perhaps the liberty of the whole may depend; may be burthened, impeded, if not arrested, by any of the organized parts of the confederacy.
In a society formed like ours, with one supreme government for national purposes, and numerous state governments for other purposes; in many respects independent, and in the uncontrolled exercise of many important powers, occasional interferences ought not to surprise us. The power of taxation is one of the most essential to a state, and one of the most extensive in its operation. The attempt to maintain a rule which shall limit its exercise, is undoubtedly among the most delicate and difficult duties which can devolve on those whose province it is to expound the supreme law of the land in its application to the cases of individuals. This duty has more than once devolved on this Court. In the performance of it we have considered it as a necessary consequence from the supremacy of the government of the whole, that its action in the exercise of its legitimate powers, should be free and unembarrassed by any conflicting powers in the possession of its parts; that the powers of a state cannot rightfully be so exercised as to impede and obstruct the free course of those measures which the government of the states united may rightfully adopt.
This subject was brought before the Court in the case of M'Cullough vs. The state of Maryland[(a)], when it was thoroughly argued and deliberately considered. The question decided in that case bears a near resemblance to that *467 which is involved in this. It was discussed at the bar in all its relations, and examined by the Court with its utmost attention. We will not repeat the reasoning which conducted us to the conclusion thus formed; but that conclusion was that "all subjects over which the sovereign power of a state extends, are objects of taxation; but those over which it does not extend, are upon the soundest principles exempt from taxation." "The sovereignty of a state extends to every thing which exists by its own authority, or is introduced by its permission;" but not "to those means which are employed by congress to carry into execution powers conferred on that body by the people of the United States." "The attempt to use" the power of taxation "on the means employed by the government of the union in pursuance of the constitution, is itself an abuse, because it is the usurpation of a power which the people of a single state cannot give."
The Court said in that case, that "the states have no power by taxation, or otherwise, to retard, impede, burthen, or in any manner control the operation of the constitutional laws enacted by congress, to carry into execution the powers vested in the general government."
We retain the opinions which were then expressed. A contract made by the government in the exercise of its power, to borrow money on the credit of the United States, is undoubtedly independent of the will of any state in which the individual who lends may reside, and is undoubtedly an operation essential to the important objects for which the government was created. It ought, therefore, on the principles settled in the case of M'Cullough vs. The State of Maryland, to be exempt from state taxation, and consequently from being taxed by corporations deriving their power from states.
It is admitted that the power of the government to borrow money can not be directly opposed, and that any law directly obstructing its operation would be void; but, a distinction is taken between direct opposition and those measures which may consequentially affect it; that is, that a law prohibiting loans to the United States would be void, but a tax on them to any amount is allowable.
It is, we think, impossible not to perceive the intimate *468 connexion which exists between these two modes of acting on the subject.
It is not the want of original power in an independent sovereign state, to prohibit loans to a foreign government, which restrains the legislature from direct opposition to those made by the United States. The restraint is imposed by our constitution. The American people have conferred the power of borrowing money on their government, and by making that government supreme, have shielded its action, in the exercise of this power, from the action of the local governments. The grant of the power is incompatible with a restraining or controlling power, and the declaration of supremacy is a declaration that no such restraining or controlling power shall be exercised.
The right to tax the contract to any extent, when made, must operate upon the power to borrow before it is exercised, and have a sensible influence on the contract. The extent of this influence depends on the will of a distinct government. To any extant, however inconsiderable, it is a burthen on the operations of government. It may be carried to an extent which shall arrest them entirely.
It is admitted by the counsel for the defendants, that the power to tax stock must affect the terms on which loans will be made; but this objection, it is said, has no more weight when urged against the application of an acknowledged power to government stock, than if urged against its application to lands sold by the United States.
The distinction is, we think, apparent. When lands are sold, no connexion remains between the purchaser and the government. The lands purchased become a part of the mass of property in the country with no implied exemption from common berthens. All lands are derived from the general or particular government, and all lands are subject to taxation. Lands sold are in the condition of money borrowed and re-paid. Its liability to taxation in any form it may then assume is not questioned. The connexion between the borrower and the lender is dissolved. It is no burthen on loans, it is no impediment to the power of borrowing, that the money, when re-paid, loses its exemption from taxation. *469 But a tax upon debts due from the government, stands, we think, on very different principles from a tax on lands which the government has sold.
"The Federalist" has been quoted in the argument, and an eloquent and well merited eulogy has been bestowed on the great statesman who is supposed to be the author of the number from which the quotation was made. This high authority was also relied upon in the case of M'Cullough vs. The state of Maryland, and was considered by the Court. Without repeating what was then said, we refer to it as exhibiting our view of the sentiments expressed on this subject by the authors of that work.
It has been supposed that a tax on stock comes within the exceptions stated in the case of M'Cullough vs. The state of Maryland. We do not think so. The bank of the United States is an instrument essential to the fiscal operations of the government, and the power which might be exercised to its destruction was denied. But property acquired by that corporation in a state was supposed to be placed in the same condition with property acquired by an individual.
The tax on government stock is thought by this Court to be a tax on the contract, a tax on the power to borrow money on the credit of the United States, and consequently to be repugnant to the constitution.
We are, therefore, of opinion that the judgment of the constitutional court of the state of South Carolina, reversing the order made by the court of common pleas, awarding a prohibition to the city council of Charleston, to restrain them from levying a tax imposed on six and seven per cent. stock of the United States, under an ordinance to raise supplies to the use of the city of Charleston for the year 1823, is erroneous in this; that the said constitutional court adjudged that the said ordinance was not repugnant to the constitution of the United States; whereas, this Court is of opinion that such repugnancy does exist. We are, therefore, of opinion that the said judgment ought to be reversed and annulled, and the cause remanded to the constitutional court for the state of South Carolina, that farther proceedings may be had therein according to law.
*470 Mr Justice JOHNSON, dissentiente.
Entertaining different views on the questions in this cause from the majority of the Court, and wishing generally that my reasons for my opinions on constitutional questions should appear, where they cannot be misunderstood or misrepresented, I will briefly state the ground upon which I dissent from the decision now rendered.
On the first point I am of opinion, that the cause is not one within either the letter or the policy of the 25th section of the judiciary act.
That the suggestion and motion to obtain a prohibition is a suit in its general sense, cannot be questioned; but that is not enough, to give this Court jurisdiction; it must be a suit within the meaning and policy of the law which gives this writ of error. The words of the 25th section are, "a final judgment or decree on any suit;" from which I think it unquestionable that it must be a suit capable of terminating in a final judgment or decree. Now a prohibition, especially where it is refused, as in this case, is not final, and concludes no body. If the party against which it was prayed goes on to carry into effect an unconstitutional law, he to whom it was refused, is at liberty to bring his action of trespass, and the refusal of the prohibition would be no bar to his recovery.
Indeed, in cases of prohibition, there is no consideratum est, no judgment entered, except, as well as I can recollect, in two cases: in that where it is first granted and then dissolved, and a writ of consultation awarded authorizing the defendant to proceed; and in the case where the promovent is ruled to declare, and the cause goes on to judgment in the usual form. When it is refused there is never a judgment entered, nor where it is granted in ordinary cases; and hence it is laid down generally that no writ of error lies in prohibition. There is no ground that I can perceive, to suppose that congress intended any innovation in the ordinary rules of law as to suing out writs of error. On the contrary, in authorizing a writ of error to a final judgment in so many words, the legal conclusion is that they need not to adhere to the rule that a writ of error can only issue to recover a judgment as technically understood.
*471 Again, the suit to which this section has relation must be a suit in which this Court possesses or can exercise the power to enter judgment and award execution; because the latter part of the 25th section enacts, "that the Supreme Court may at their discretion, if the cause shall have been once remanded before, proceed to a final decision of the same, and award execution. Now if the term execution here be taken in its ordinary technical meaning, this is not a case in which it can issue; the sole object of this prohibition being to stay the proceedings of the city council and city sheriff under the law complained off; and if the issuing of a prohibition be considered as coming within the meaning of execution as here used, then this Court has no power to issue a prohibition to a state, court or state officer. Congress has not pretended to vest in it such authority. And I am well satisfied that this power has been withheld from the courts of the United States ex industriâ. For every provision in the constitution and the uniform policy of the government, have been to prevent the immediate action of the one government upon the constituted authorities of the other, a collision which it was a leading object in the constitution to avoid, because its effects were unavoidably and fully anticipated.
If it be asked, or has been argued, why may not this Court proceed as far as it can proceed, and reverse the judgment of the state court, or enter a judgment for a prohibition, though it cannot issue it; I answer, simply because the case wants those distinctive features which are necessary to make out a case for the interference of this Court under the 25th section. And I cannot imagine that the legislature would place this Court in the unenviable dilemma of thus assuming ungranted powers, or of exercising jurisdiction in a case over which it could assume no coercive power.
Hence I conclude, that neither the letter nor the policy of the law, sanctions us in exercising this jurisdiction. Nor is there the least necessity for it, since every beneficial end may be answered, when individuals are brought into controversy, by the ordinary proceedings under an unconstitutional *472 law; and until this conflict of interest arise from the actual execution of process, the law remains a mere "brutum fulmen."
My views, of the question of jurisdiction would exempt me from the necessity of giving an opinion on the constitutionality of the case under consideration. But I have no objection to expressing my opinion upon this question.
If I could bring myself to consider this question in the form in which it is considered by the majority of the Court, I should certainly concur in the opinion, that the tax was unconstitutional. For, the exercise of a power, which, under the mask of imposing a tax, may defeat or impede the operation of the government of the United States in borrowing money, could not be tolerated. But I am strongly impressed with the opinion, that the record does not authorise this state of the question. It is true the act of the city council of Charleston, which imposes this tax, is most clumsily worded. But I think it clear that, taken together, the object is to impose an income tax. This, I think, is necessarily inferred from the fact, that the tax is not imposed upon money at interest generally, but only on so much as the individual has at interest above what he owes or pays an interest upon. The operation of this is to charge no more than his clear income from money at interest. It is objected, that they make discriminations, and exempt from taxation state stock, city stock, and stock of their own chartered banks. But then they exempt also, stock of the United States bank; and there can be no better proof demanded to show, that the law is conceived in the spirit of fairness, with a view to revenue, and no masked attack upon the powers of the general government. Had they, in fact, taxed any one of these excepted objects, we should have had the law brought up here as a violation of the obligation of contracts; since the statute books of the state will show, that all their banks, with the exception of the state bank, have paid a bonus to the state. And it would have been impossible to tax the state bank, because the stock is altogether owned by the state, and the laws of the council are subject to be repealed by the state.
*473 As to the specification of six and seven per cent. stock of the United States as objects of taxation, this also admits of an explanation, showing that the council acted in the spirit of fairness and candour, although certainly not happy in expressing the legislative mind. This specification became necessary, from their imposing the tax by means of a per centage of twenty-five cents upon the capital at interest, instead of a per centage on the interest received. Hence to have brought the four and three per cent. stock of the United States under the tax, would have been unequal and unjust; and there can be little doubt that to avoid this inequality was their object.
I consider the case therefore as one of a tax upon income arising from the interest of money, a very unwise and suicidal tax unquestionably, and not very judiciously arranged and expressed; but still characterized by no unfairness, and no masked attack upon the powers of the general government. And if so, with what correctness can it be characterized as unconstitutional?
Why should not the stock of the United States, when it becomes mixed up with the capital of its citizens, become subject to taxation in common with other capital? Or why should one who enjoys all the advantages of a society purchased at a heavy expense, and lives in affluence upon an income derived exclusively from interest on government stock, be exempted from taxation?
No one imagines that it is to be singled out and marked as an object of persecution, and that a law professing to tax, will be permitted to destroy: this subject was sufficiently explained in M'Cullock's case. But why should the states be held to confer a bonus or bounty on the loans made by the general government? The question is not whether their stock is to be exposed to peculiar burthens; but whether it shall enjoy privileges and exemptions, directly interfering with the power of the states to tax or to borrow.
I can see no reason for the exemption, and certainly cannot acquiesce in it
Mr Justice THOMPSON, dissentiente.
This case comes before us under the 25th section of the judiciary act of 1789, *474 on a writ of error to the constitutional court of the state of South Carolina, the highest court of appeals in that state. The question in the state court arose upon proceedings commenced in an inferior court, and the issuing of a prohibition to restrain the city council of Charleston, and all other persons acting under their authority, from levying and collecting a tax on stock of the United States, held by the appellants; on the ground, that such tax was a violation of the constitution of the United States. The prohibition having been granted by the inferior court, the order and judgment of that court were reversed in the constitutional court, thereby upholding the constitutionality of the tax.
A preliminary question has been raised, whether this Court has jurisdiction of the case, under the 25th section of the judiciary act. I think we have not. It is not a suit within the meaning of that section; and if it was, the writ of error is brought to reverse a judgment, refusing to grant the prohibition. And if that judgment or order should be reversed here, this Court has no power to enforce its judgment, or give the party any relief or protection against the imposition of the tax. But I shall not enter into an examination of this question: it is one of minor importance; as I understand this Court does not claim the power of enforcing its judgment in any manner whatever, and the ordinance will remain in full force, and the payment of the tax be enforced unless the city council shall voluntarily repeal it, and revoke the order to collect the tax. The judgment of this Court is, therefore, no more than an opinion expressed upon an abstract question, and in its nature and effect only monitory.
In considering this case on the merits, it is to be borne in mind, that this ordinance of the city council is subject to be repealed by the legislature of South Carolina, and not having been done, we must consider it as having tacitly received the sanction of the legislature, and comes before us, therefore, with all the force and authority of a state law, and involves one of those delicate and difficult inquiries of conflicting powers between the general and state governments.
It is necessary, in the first place, that we should understand the true character of this tax. Much importance seemed to *475 be attached to this, both in the court below and on the argument here. In the opinion of the minority of the state court, which has been submitted to us by the appellants' council as a part of his argument, it is said, "this ordinance does not affect to regard the tax as an income tax. It is a tax upon the United States stock eo nomine. As it is not a tax on income, it is unnecessary to inquire, if the city council or a state have the power to tax income, and include therein the interest received on United States stock. The inquiry is, whether there is any such power to tax United States stock eo nomine." This distinction being so emphatically relied upon by the minority of the Court, it is a fair inference, that if it had been considered a tax on income, it would not be objectionable on constitutional grounds.
What are we to understand by its being a tax on United States stock eo nomine? Certainly, nothing more than that it is enumerated as one description, in a long list of specified property subject to taxation.
We have not the ordinance at large before us, but the clause upon which the question arises, is stated as follows: All personal estate, consisting of bonds, notes, insurance stock, &c. &c. six and seven per cent. stock of the United States, or other obligations, upon which interest has been, or will be received during the year, over and above the interest which has been paid, twenty-five cents on every hundred dollars. There is excepted out of this enumeration, stock of the state, stock of the city, and bank stock. But this exception cannot certainly affect the present question. No part of the constitution of the United States, prohibits the states from exempting from taxation certain species of property, according to their own views of policy or expediency.
What then is the ordinance in substance? It is a tax upon the net income of interest, upon money secured by bonds, notes, insurance stock, six and seven per cent. stock of the United States, or other obligations, upon which interest has been received, &c. It is the net interest received upon which the tax is laid. For the ordinance declares the tax shall be on the interest received over and above that *476 which has been paid. For example: he who receives $1000 interest, and pays out $500 interest, is taxed only upon the balance. It is, therefore, a general tax upon an income from money at interest, and this too only included as one item in the enumeration of taxable property. It is not an objection that can be made here, if any where, that the tax is not upon the whole income. It is a tax, general in its application to income, from interest derived from investments of every description (with the exception mentioned) and money on loan. It cannot be considered as an exorbitant tax, or in any manner partaking of the character of a penalty. It being only a tax of a quarter of one per cent.
If the objection to this tax is to be sustained, it must be on the broad ground that stock of the United States is not taxable in any shape or manner whatever; that it is not to be included in the estimate of property subject to taxation: and that I understand is the extent to which a majority of this Court mean to carry the exemption. As I am unable to come to this conclusion, and it being a constitutional question of vital importance; I am constrained to dissent from the opinion of the Court, and, contrary to my usual practice in ordinary cases, briefly to assign my reasons.
I shall, for the reason already mentioned, consider this ordinance as standing upon the same grounds precisely as if it had been a law of the state of South Carolina.
It is not pretended that there is any express prohibition in the constitution of the United States, which has been violated by this law.
The only express limitation to the power of the individual states, to lay and collect taxes, is to be found in the 10th section of the first article of the constitution. "No state shall, without the consent of congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws, &c. No state shall, without the consent of congress, lay any duty of tonnage." The tax in question can certainly not fall within either of these prohibitions.
The objection to the tax is rested chiefly, if not entirely, upon that part of the 8th section of the first article, which *477 gives to congress the power "to borrow money on the credit of the United States." And it is said that to permit the states to tax the stock, might, by possibility, sometimes embarrass the United States in procuring loans. In the examination of the powers of the general government under the constitution, "The Federalist" is often referred to as a work of high authority on questions of this kind; and the author has seldom been charged with surrendering any powers that can be brought fairly within the letter or spirit of the constitution. In No. 32 of that work, the writer, in discussing the subject of taxation, and the conflicts that might arise between the general and state governments, says, "Although I am of opinion that there would be no real danger of the consequences to the state governments, which seem to be apprehended from a power in the union to control them in the levies of money, yet I am willing to allow, in its full extent, the justness of the reasoning, which requires that the individual states should possess an independent and uncontrollable authority to raise their own revenues for the supply of their own wants. And making this concession, I affirm, that (with the sole exception of duties on imports and exports) they would, under the plan of the convention, retain that authority, in the most absolute and unqualified sense; and that an attempt on the part of the national government to abridge them in the exercise of it, would be a violent assumption of power, unwarranted by any article or clause of its constitution. That a negation of the authority of the states to impose taxes on imports and exports, is an affirmance of their authority to impose them on all other articles. That it is not a mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy, that can by implication alienate and extinguish a pre-existing right of sovereignty."
The power of the general government to borrow money on the credit of the United States, is not only an express power granted to congress, but one that it must have been foreseen would be brought into practical operation, and that stock would of course be created; and yet it never entered into the discriminating mind of the writer referred *478 to, that merely investing property, subject to taxation, in stock of the United States, would withdraw the property from taxation. It is said, the credit of the United States is a creation of the general government, which did not exist until they brought it into being, and in the production of which the state governments did not participate; that the states could not tax it before the constitution was formed, for it did not exist. This view of the subject is calculated to make an erroneous impression. It is true it did not exist in the shape of stock, but the property existed in some other form. No one procures stock without exchanging for it an equivalent in money or some other property; all which was, doubtless, subject to the payment of taxes. Exemption from taxation may hold out an inducement to invest property in stock of the United States, and might, possibly, enable the government to procure loans with more facility, and perhaps on better terms. But this possible, or even certain benefit to the United States, cannot extinguish pre-existing state rights. To consider this a tax upon the means employed by the general government for carrying on its operations, is, certainly, very great refinement. It is not a tax that operates directly upon any power or credit of the United States. The utmost extent to which the most watchful jealousy can lead is, that it may, by possibility, prevent the government from borrowing money on quite so good terms. And even this inconvenience is extremely questionable; for the stock only pays the same tax that the money with which it was purchased did. And whether the property exists in one form or the other, would seem to be matter of very little importance to the owner. But great injustice is done to others, by exempting men who are living upon the interest of their money, invested in stock of the United States, from the payment of taxes; thereby establishing a privileged class of public creditors, who, though living under the protection of the government, are exempted from bearing any of its burthens. A construction of the constitution, drawing after it such consequences, ought to be very palpable before it is adopted.
But it seems to me, that the right of the states to tax property *479 of this description is admitted by the Court, in the case of M'Cullough vs. The state of Maryland, 4 Wheat. 436. The Court there considered the tax imposed directly upon the operations of the bank, which was employed by the government as one of the means of carrying into execution its constitutional powers; and in summing up the result, it is said, the states have no power by taxation, or otherwise, to retard, impede, burthen, or in any manner control the operations of the constitutional laws of congress, to carry into execution the powers vested in the general government; and yet the Court say this opinion does not extend to a tax paid by the real property of the bank, in common with the other real property within the state, nor to a tax imposed on the interest which the citizens of Maryland may hold in the bank, in common with other property of the same description throughout the state.
In the case now before us, the tax is not direct upon any means used by the government to carry on its operation. It is only a tax upon property acquired through one of the means employed by the government to carry on its operations, viz. the power of borrowing money upon the credit of the United States; and it is not perceived how any just distinction can be made in this respect, between bank stock, and stock of the United States; both are acquired through the medium of means employed by the government in carrying on its operations; and both are held as private property; and it is immaterial to the present question in what manner it was acquired.
The broad proposition (laid down in the case of M'Cullough vs. The state of Maryland) that the states cannot tax any instrument or means used by the general government in the execution of its powers, must be understood as referring to a direct tax upon such means or instrument; and that such was the understanding of the Court, is to be inferred from the exemption of bank stock from the operation of the rule; and the parallel cases put to illustrate the application of the doctrine lead to the same conclusion. Thus it is said the states cannot tax the mint; but this does not imply that they may not tax the money coined at the mint, when held and owned by individuals. Again, it is said the states cannot *480 tax a patent right; but if the patentee, from the sale or use of his patent has acquired property, or is receiving an income, it could not be intended to say that such property or income cannot be taken into the estimate of his taxable property.
The unqualified proposition that a state cannot directly or indirectly tax any instrument or means employed by the general government in the execution of its powers, cannot be literally sustained. Congress has power to raise armies, such armies are made up of officers and soldiers, and are instruments employed by the government in executing its powers; and although the army, as such cannot be taxed, yet it will not be claimed, that all such officers and soldiers are exempt from state taxation. Upon the whole, considering that the tax in question is a general tax upon the interest of money on loan, I cannot think it any violation of the constitution of the United States, to include therein interest accruing from stock of the United States.
I am accordingly of opinion, that there is no error in the opinion of the state court.
This cause came on to be heard on the transcript of the record from the constitutional court of the state of South Carolina, and was argued by counsel; on consideration whereof, this Court is of opinion, that there is error in the judgment of the said court in this, that the said court decided that an ordinance passed by the city council of Charleston for the year 1823, entitled, an ordinance to raise supplies for the use of the city of Charleston for the year 1823, is, so far as the same imposes a tax on the six and seven per cent. stock of the United States, consistent with the constitution of the United States. Whereas, it is the opinion of this Court, that so much of the said ordinance as imposes the said tax, is repugnant to the constitution of the United States, and void. Whereupon it is considered, ordered and adjudged by this Court, that the said judgment be, and the same is hereby reversed and annulled, and that the said cause be, and the same is hereby remanded to the said constitutional court for the state of South Carolina, that such further proceedings may be had therein as may consist with law and justice.
NOTES
[(a)] 4 Wheaton, 316.